501 P.2d 1079

**Jay E. BANKS, Plaintiff,**

**v.**

**Clyde L. MILLER, Secretary of State of the State of Utah, Defendant.**

**J. Robert BULLOCK, Plaintiff,**

**v.**

**Clyde L. MILLER, Secretary of State of the State of Utah, Defendant.**

**Jackson HOWARD, Plaintiff,**

**v.**

**Clyde L. MILLER, Secretary of State of the State of Utah, Defendant.**

**Nos. 12973, 12991, 12986.**

Supreme Court of Utah.

Oct. 6, 1972.

Henriod and Crockett, JJ., dissented and filed opinions.

---

Sumner J. Hatch, of Hatch, McRae & Richardson, Salt Lake City, for Banks.

J. Robert Bullock, pro se.

Jackson Howard, of Howard & Lewis, Provo, for Jackson Howard.

Vernon B. Romney, Atty. Gen., Salt Lake City, for defendant.

ELLETT, Justice:

This matter is before the court on a petition for a writ of mandamus.

The question which we must decide is whether a lawyer can file for election to a judgeship made vacant by the inability of the incumbent to file for re-election because of mandatory retirement.

Section 20–1–7.1, U.C.A.1953 as amended in 1967, provides:

Except as otherwise provided in this act, . . . judges of the district courts shall be selected, and a vacancy in any such office be filled, by appointment . . .

The only exception provided for is found in Section 20–1–7.7, U.C.A.1953 as amended in 1971, which provides that when any incumbent judge files for re-election, any qualified member of the bar may likewise file for the office and thus run against the incumbent.

The Constitution of Utah originally provided for *election* of judges, but in 1944 it was amended to provide for the *selection* of judges. The amendment reads as follows:

Judges of the Supreme Court and district courts shall be selected for such terms and in such manner as shall be provided by law, provided, however, that selection shall be based solely upon consideration of fitness for office without regard to any partisan political considerations and free from influence of any person whomsoever, and provided further that the method of electing such judges in effect when this amendment is adopted shall be followed until changed by law.

The Legislature provided for a method of *selecting* judges, and we must honor that law.

In the instant action, since the incumbent judge is ineligible to file a declaration of candidacy because of the Retirement Act, the vacancy which will occur in January of 1973 must be filled by appointment.

The petition is denied.

CALLISTER, C. J., and TUCKETT, J., concur.

HENRIOD, Justice (dissenting):

I dissent, believing the main opinion's reasoning and conclusion are an oversimplification of the issue here.

It is axiomatic that generally government is best that governs least,—all with the consent of the governed. Hence, any doubt as to eligibility for high public office should be resolved by the electorate in a reserved power, federal-state republic as we conceive it. Disenfranchisement is the seal of doom for an erstwhile free people, —and in my opinion the subject legislation here is not only an attempt to emasculate an historical, traditional and absolute right of the people to vote for judges of their choice, but a devious method to give to the state executive department a wholly unauthorized prerogative to appoint judges, while reserving such right of choice to the people only as to the legislative and executive branches.

It is no answer to say the federal system condones such a system, else the Tenth Amendment becomes meaningless, or totally ignored as seems to have been the wont of the federal judiciary, which this writer, for one, has no bent for emulation by the states.

The conclusion of the main opinion precludes three distinguished members of the Bar,—one its President,—from presenting their names to their peers for election or rejection at the poles,—as has been the custom for 75 years, from statehood until this case came along. These three eminent lawyers and the battery of lawyers representing them, do not share the reasoning and conclusion of the main opinion,—which is some indication that the subject legislation not only is unconstitutional for vagueness and obfuscation, but, if approved, is offensive to our concepts of reservation of choice to the people, including the little people as well as suspicionable pressure groups. In this respect, it is highly significant that the amendment around which this litigation revolves, was initiated by S. J.R. No. 2, put to the people in the 1944 general election, and passed on November 7, 1944, *made effective as of January 1, 1945*. This effective date is important, I think, as I will point out later.

What I say above seems to have been reflected early in 1895, three years before statehood, when, at the Constitutional Convention at Salt Lake City, Mr. D. C. Eichnor, delegate from Salt Lake City's First Precinct, on April 22, 1895, in a debate re-

volving around election of Supreme Court Associate and Chief Justices, allowed that he ."was not afraid of the people" and that "I believe in trusting this measure to the people." Three days later, on April 25, 1895, Mr. C. C. Goodwin, delegate from the Salt Lake City Fifth Precinct, echoed Mr. Eichnor's sentiments by saying that with respect to the Supreme Court justices, they should be "the best men for the place" and "all the people to vote on them." The philosophy of these two gentlemen was carried from the Territory of Utah into the State of Utah in 1896, where it firmly was impacted in the Constitution, until 1944, when some people may have been confused when authority was urged to invest the people at the polls, significantly while we were preoccupied by World War II, to amend the Constitution to read as it does today, in Art. VIII, Sec. 3, which obviously was designed to streamline the *method* of acquiring judges, but equally to preserve the historical and traditional institution of *electing* these judges to office. The main opinion *does not mention this basic constitutional interdiction*, but simply recites Sec. 20–1–7.1, U.C.A.1953 as amended in 1967, which pretends to but does not implement or follow Art. VIII, Sec. 3. That amendment clearly says, (after talking about the now deceased aphorisms anent prohibitions against "partisan political considerations" and freedom "from influence of any person whomsoever"): ". . .

provided further that the *method of electing* such judges in effect when this amendment is adopted shall be followed until changed by law." The word "method" is the subject of the phrase, and "shall be followed," the predicate. No one can assume other than "until changed by law" applies to the *method* of "electing" judges, not to the fact of election,—which means dropping something in a ballot box to reflect a choice, and not to sanction a gubernatorial congratulatory letter designating a person belonging to his own political party, —as has been the case in appointments of supreme and district court justices for over 20 years. The phrase ". . . provided further that the *method of electing* such judges in effect when this amendment is adopted* shall be followed until changed by law," can mean nothing other than what it says, and the "method . . . in effect at the time when this amendment" was adopted on November 7, 1944, and since 1896, was the method found in Art. VII, Sec. 2, of the Constitution, and Art. VIII, Sec. 5 (see Utah Code Annotated 1943), that which existed on November 7, 1944, before the effective date of the amendment resulting from S.J.R. 2 of the 1943 Legislature (January 1, 1945), to the effect that "The Judges of the Supreme Court *shall be elected* by the electors of the State at large," and district court "judges shall be chosen by the qualified electors. . . ." Not only did these provisions perpetuate

the traditional requirement of *electing*,—not appointing Supreme and District Court judges,—but so did the very amendment of 1944 which the main opinion fails to mention, and which the so-called attempt to implement is suggested in Title 20–1–7.1, when such amendment clearly says such an *election* cannot be implemented except as to *method* of election,—not construable to mean the elimination of the requirement that such judges must be elected.

The main opinion quotes only one part of Sec. 20–1–7.1, concerning an appointment by the Governor in the case of a vacancy, except where an incumbent, under 20–1–7.7, files for office, in which case a lawyer, such as the petitioners here, could file and take his chance to be elected. The remainder of Sec. 20–1–7.1, provides that where such an appointment is made from a list of three given to the Governor, the appointee even in that event "shall be subject *to election by the voters at the time and in the manner provided in this act*,"—clearly indicating that there was no legislative intent to abolish the time-honored *election* of judges in this State, and negating any possible suggestion that the Governor should have any power to appoint, without an election, a judge for a full term, as is suggested or implied in the main opinion. The vacancy about which the main opinion talks, (that may be a misnomer since there really is not a vacancy which that term

connotes, created by death, resignation, and the like, but only a future term to be filled somehow) is not restricted in the main opinion to one persisting only until the next General Election, as is reflected in all other statutes which apparently are designed to implement Art. VIII, Sec. 3, but all of which talk about and provide for an *election* by the people, at the first opportunity,—which is the General Election. To say otherwise is to destroy by some sort of statutory implementational legerdemain, the established constitutional interdiction, conceived, born and nourished by history, tradition, Messrs. Eichnor and Goodwin, the Constitutional Convention, 75 years of acceptance, the 1944 Amendment of Art. VIII, Sec. 3 itself, the language of all so-called implementing statutes, all of which use language making it perfectly clear that the framers of the Constitution and the legislatures and the people, since statehood, had no bent for such destruction.

Any argument that the Judges' Retirement Act[1] makes judges ineligible to run for re-election, and thus makes the position appointive, cannot and should not by any strained logic or rhetoric eliminate the people's right to vote for their judges by any quirk of legislative negligence in failing to recognize such constitutional right. Any statute purporting to invade that right by implementation is unconstitutional under

1. Title 49–7–1.1, Utah Code Annotated, 1953 (Ch. 122, Sec. 1, Laws of Utah 1969).

prevailing constitutional sanctions and should be declared to be so.

The Attorney General says in his brief that "The wisdom of the manner of appointment *and election* of judges might be challenged by some, but that is a *legislative* determination." Not so, if that is meant to give the impression that the legislature can eliminate the election of judges. The manner of appointment might be, and the method of election might be, but the *election* of judges is not. That was reserved to the people in 1896 and to this day, and the Attorney General has not deigned either to trace, discuss, analyse or comment on the historical or constitutional interdictions or sanctions anent the issue before us, or their basics, but chooses to conclude, apparently without citing any constitutional authority therefor, that some legislation can: Change basic, established, written constitutional provisions and concepts without .another constitutional amendment decided by the people by choice at an election.

It is rather obvious that the Retirement Act has created a situation where an incumbent cannot run for re-election, leaving a vacuum or hiatus where there is no specific provision for the election of his successor. The constitution has never been amended to eliminate the necessity for election of judges by the people. The main opinion obviously has in mind the Retirement Act because that is the one involved in the factual situation of this case. Also, a so-called implementing statute, which simply attempts to change the Constitution of Utah to eliminate the constitutional requirement of the election of judges, by unauthorized legislative constitutional change and by equally unauthorized judicial legislation, to effect such change.

The petitioners should have their names placed on the ballot, having tendered their filing fees at the time and place appointed, leaving it up to the people to elect them to the positions they seek, or to defeat them with a write-in vote, or for the Governor to call a special session, if possible, to rectify what I think will be an unconstitutional disenfranchisement of the people who are invested with every even debatable right to elect their judges without the benefit of ambiguous, doubtful, historical, legal prestidigitation, or ill-advised ectoplasmic legislation.

CROCKETT, Justice (dissenting):

I do not join with my colleagues of the majority in adhering to what impresses me as unnecessarily strict and literal interpretation of the statutes. Perhaps partly out of my desire as to what the law ought to be, and partly out of my view as to the general purpose of our statutes on judicial reform, I would prefer to take the view adopted by the plaintiffs and their advocates: that inasmuch as there was a

known vacancy in the district judgeship, and that the vacancy was known to exist before the filing time (during the month of June 1972) and thus long before the next general election (November 7, 1972), the general intent and purpose of the act would be carried out by permitting them to file and the public be allowed to vote upon them in that election.

One of the most fundamental rules of statutory construction is that they should be looked at as a whole, in the light of their general purpose, and should be so interpreted and applied as to accomplish that objective.[1] Further, in order to give a statute the implementation which will fulfill its purpose, the underlying reason and intention should sometimes prevail over technically applied literalness.[2]

It has seemed to me that the general purpose of our judicial reform statutes including those applicable here was not to convert to a completely appointive system. I cannot believe that either the legislature which enacted the present law, or the people who authorized a change in the "method of *election*" by the constitutional amendment had any intention that the judiciary should become any "closed shop" through a practically exclusive appointing process. The objective was to provide for

an appointment in the event of vacancy, on an interim basis, and yet to preserve to the public the opportunity of voting upon the judgeship at the earliest opportunity.

The proposition just stated was taken cognizance of in this act in Section 20–1–7.7, U.C.A.1953, which provides that any judge who holds office under such an appointment shall hold only " . . . until he or his successor is *elected* and qualified, which *election* shall take place at the general election next succeeding the appointment. . . ." This leaves the way open for any qualified person to aspire to the job, for friends or supporters to encourage him to do so, and most important, it gives the people the opportunity to express their will in the selection of their judge on the nonpartisan separate election at the earliest practicable opportunity.

However, there is a difficulty which looks in the other direction, toward creating an appointive system, if we look at one portion of the next preceding section, 20–1–7.6(d). It provides that a person serving under such an appointment "shall serve for the unexpired term of his predecessor in office or *shall serve for the full term* of office provided by law in case the appointment is *to fill a vacancy in the office* of a justice or *judge whose term has expired* or

---

1. See Sutherland, Statutory Construction, Sec. 5002 (3d Ed. 1943).

2. See Norville v. State Tax Commission, 98 Utah 170, 97 P.2d 937, 126 A.L.R. 1318, quoting Sutherland on Statutory Construction to this effect.

[for] . . . a new judicial office." It will be noted that a literal application of that language would have the effect of filling such an office by a completely and undeniably appointive procedure, and of preventing any vote by the people to approve or disapprove during the entire succeeding term (six years for district judges, ten years for Supreme Court justices). In contrast to this, if Sec. 20–1–7.7 is literally applied, the appointee could serve only until the next general election, (about 22 months). There is no way he could by virtue of the appointment serve "the entire succeeding term" as stated in Sec. 20–1–7.-6(d) quoted above. In regard to this statement I concede two things: (1) that the problem is not now confronted in this case; and (2) that it only presents one part of the statute which would be considered if and when such problem does arise. But we should act in awareness that under the majority interpretation there results confusion in procedure which, together with the question of void for vagueness, can and should be avoided by reverting to the basic election procedure advocated by plaintiffs.

The following observations are submitted as forming a legitimate part of the reasoning and intent underlying and supportive of the admittedly somewhat liberal and practical application I would give the statutes to carry out their purpose. The right to choose and elect public officials is a principle foundational to our form of state government as planned and set forth in our state constitution;[3] and it should be neither distorted, destroyed nor surrendered except upon a clear and unequivocal mandate of the people knowingly declared.

I have the most profound convictions of which I am capable on these propositions: that uncontrolled power, not answerable to the people, tends to become arrogant of its own limitations and to feed on its own power. The application of this statute as does the majority, tends toward the removal of the judiciary from the people and their controls of government through democratic processes and toward the ever growing insulation of the power of government from the control of the people. On the contrary, the permitting of the plaintiffs to file and allowing the people to vote thereon would accomplish what I regard as the highly desirable and salutary objectives of harmonizing with the general purpose of the judicial reform statutes and of permitting the democratic processes to operate in accordance with that purpose and the general plan of our state government.

3. See statement in State v. Jones, 17 Utah 2d 190, 407 P.2d 571, and authorities therein cited.